# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

ROCHESTER GAS AND ELECTRIC
CORPORATION,

                                        Plaintiff,

         -vs-

DELTA STAR, INC.,

                                   Defendant.

---

DELTA STAR, INC.,

                                 Counter Claimant,

         -vs-

ROCHESTER GAS AND ELECTRIC
CORPORATION,

                               Counter Defendant.

---

DECISION and ORDER
06-CV-6155-CJS-MWP

### APPEARANCES

For Plaintiff/Counter Defendant:        Thomas S. D'Antonio, Esq.
                                        Ward, Norris, Heller & Reidy, LLP
                                        300 State Street 6th Floor
                                        Rochester , NY 14614
                                        (585) 454-0700

For Defendant/Counter Plaintiff:

Carol L. O'Keefe, Esq.
Harter, Secrest & Emery LLP
1600 Bausch & Lomb Place
Rochester , NY 14604-2711
(585) 231-1284

Daniel C. Summerlin, III, Esq.
Woods Rogers PLC
Wachovia Tower, Suite 1400
10 South Jefferson Street
P.O. Box 14125
Roanoke, VA 24011

Mark L. Belleville, Esq.
Woods Rogers PLC
107 Church Street
Blacksburg, VA 24060
(540) 552-2940

## INTRODUCTION

This diversity contract case is before the Court on Plaintiff's motion to strike four affirmative defenses from Defendant's answer. The motion was argued before the Court on December 21, 2006, but the Court withheld issuing a decision pending the parties' attempts to mediate the dispute. Subsequently, the parties informed the Court that mediation was not successful. Now, for the reasons stated below, the Court grants the application.

## BACKGROUND

The following information is taken from the undisputed portions of the parties' submissions pursuant to Local Rule of Civil Procedure 56.1 and Plaintiff's notice of motion. On February 8, 2006, Rochester Gas and Electric Corporation ("RG&E") commenced an

action for breach of contract against Delta Star, Inc. ("Delta Star") in New York State Supreme Court. On March 16, 2006, Delta Star removed the action to this Court, alleging diversity jurisdiction. A month later, Delta Star filed an answer asserting several affirmative defenses and a counterclaim. The affirmative defenses are:

1.    Doctrine of commercial impractibility;
2.    Force majeure;
3.    Failure of presupposed conditions;
4.    Estoppel;
5.    Failure to comply with N.Y. U.C.C. §§ 2-609, 2-610 and 2-616;
6.    Lack of privity;
7.    Breach of contract by RG&E; and
8.    Failure by RG&E to specify damages.

RG&E has moved for summary judgment seeking an order striking the following affirmative defenses on the basis that each is deficient as a matter of law: (1) doctrine of commercial impractibility; (2) force majeure; (3) failure of presupposed conditions; (4) lack of privity; and (5) failure of consideration.

Through a Master Agreement ("Agreement")[1] between Utility Shared Services ("USSC"), as agent for RG&E, and Delta Star, dated June 15, 2005, Delta Star agreed to sell to RG&E eight electrical transformers, as specified in subsequent purchase orders issued by RG&E. Although USSC executed the document, the Agreement specified that RG&E was the purchaser and the Delta Star was the seller. Paragraph nine of the Agreement says that "prices stated on the face of the Purchase Order, shall be considered firm, unless otherwise noted, and [Delta Star] warrants that said prices do not exceed the

---

[1]In its complaint, RG&E refers to the Agreement separately from the Transformer General Terms and Conditions ("Terms") document. However, RG&E's complaint has only the Terms document attached as Exhibit A. Accordingly, the Court will use the word "Agreement" to refer to the Terms document attached to the complaint.

prices allowed by any federal, state or local law, regulation, or order." (Agreement ¶ 9 (Compl., at Ex. A.).)

In July 2005, Delta Star received RG&E's Purchase Orders, numbered 5000010351 and 5000010353 ("Purchase Orders"), for the purchase of eight transformers at a price of $616,780 per unit. (Compl., at Ex. B.) Delta Star agreed to supply the transformers for a total price of $5,586,664.00. (Pl.'s Statement of Facts ¶ 13, Docket No. 24, at 3.)

Delta Star contends that by November 2005, the demand for M3 core steel outstripped supply and no M3 steel was to be had, since buyers in China and India were paying premiums above other markets for M4 steel. (Jaroszewski Aff. ¶ 4; Brown Aff. ¶¶ 7-8.)  On December 21, 2005, Delta Star's Sales and Marketing Manager, Kevin Anderson ("Anderson") sent a letter to USSC's Katy Maksymiu ("Maksymiu") stating, *inter alia*:

> Delta Star received notification from our sole electrical steel supplier, AK Steel, Butler, PA that they will not guarantee any core steel production as of December 7. Delta Star has relied upon this relationship for roughly forty years but now must quickly look to other suppliers…. Another factor that has definitely had an effect is the increase in distribution transformer demand due to the hurricanes[2] hitting the gulf coast.…
>
> The predictable results of this is dramatically overall higher prices and some designs requiring modification to accommodate other grades of core steel and changes to guaranteed losses.…
>
> The grave reality of the situation is the Delta Star has no choice but to submit these increased prices to all our customers. This is a force majeure condition impossible for us to predict and impossible for us to deal with any other way.…
>
> To clarify, Delta Star must ask for excess core steel increases and nothing more. The exact amount of the increase can be substantiated by our

---

[2]The Court notes that Hurricane Katrina formed on August 23, 2005, and the storm surge it created caused severe damage along the Gulf coast. *See* Hurricane Katrina, Wikipedia (*available at* http://en.wikipedia.org/wiki/Katrina_Hurricane), last accessed on July 11, 2008.

> invoices for core steel actually used for your unit compared with the recent
> invoice of December 5, 2005 showing a final price of $0.98/lb.…

(Letter from Kevin Anderson, Delta Star, to Katy Maksymiu, USSC (Dec. 21, 2005), Compl,

at Ex. C.) The letter further stated that Delta Star anticipated the per unit increase in price

for RG&E's transformers to be $67,183.00, for a total increase of $537,464.00 over the

contract price.

The Agreement between Delta Star and USSC contained a force majeure provision

that reads as follows:

20. Force Majeure

Any delay or failure in the performance by either Party hereunder shall be
excused if and to the extent caused by the occurrence of a Force Majeure.
For purposes of this Agreement, Force Majeure shall mean a cause or event
that is not reasonably foreseeable or otherwise caused by or under the
control of the Party claiming Force Majeure, including acts of God, fires,
floods, explosions, riots, wars, hurricane, sabotage terrorism, vandalism.
accident, restraint of government, governmental acts, injunctions, labor
strikes, other than those of Seller or its suppliers, that prevent Seller from
furnishing the materials or equipment, and other like events that are beyond
the reasonable anticipation and control of the Party affected thereby, despite
such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect
of such acts, events or occurrences, and which events or the effects thereof
are not attributable to a Party's failure to perform its obligations under this
Agreement. The Parties agree to use reasonable efforts to mitigate the
effects of events of Force Majeure. The affected Party shall promptly give
written notice to the other Pam of the occurrence or impending occurrence
of a Force Majeure, specifying the nature of the delay, and the probable
extent of the delay, if determinable. Following the receipt of any written
notice of the occurrence of a Force Majeure, the Parties shall meet to
determine what fair and reasonable adjustment to the delivery schedule or
the price, may be necessary to compensate for the effect of the Force
Majeure upon Seller's performance hereunder. No failure to so agree shall
excuse continuing delay or nonperformance.

(Agreement ¶ 20, Compl., at Ex. A.) Delta Star points out that

the original contract contained a force majeure clause that provided unilateral protection to RGE and not Delta Star. Delta Star rejected that clause because it wanted protection from unforeseen and uncontrollable events that could negatively impact market conditions and performance under the Agreement. RGE subsequently drafted the force majeure provision contained in paragraph 17.

(Def.'s[3] Local Rule 56.1 Statement ¶ 17.)

RG&E and Delta Star engaged in discussions relative to Delta Star's December 21, 2005, letter and its force majeure assertion. In a letter dated January 19, 2006, USSC stated that Delta Star, "appears to be rejecting its obligation to deliver the transformers for the price specified in the Agreement." (Letter from Steven W. Oakes, Director, Procurement Services, USSC, to Kevin Anderson, Sales and Marketing Manager, Delta Star (Jan. 19, 2006), at 1 (Compl., at Ex. D.).) Consequently, USSC asked Delta Star "to provide USSC with adequate assurances that it will perform the Agreement in accordance with its terms." (*Id*.)

In a January 25, 2006, letter, Delta Star proposed that USSC agree to a delay in the delivery date for the eight transformers, and pay Delta Star "an amount equal to the increase in core steel" which "would be refunded to [USSC] on or before December 31, 2006." Finally, Delta Star proposed to change the metal to be used from M3 steel to M4 steel. (Letter from Stephen D. Newman to Steven W. Oakes (Jan. 25, 2006), at 1 (Compl., at Ex. E.).) USSC's senior attorney responded to the January 25 letter with a letter dated February 1, 2006, in which he stated that, "it must be reiterated that USSC does not agree that the circumstances relied on by Delta Star are an event of force majeure." (Letter from Jeffrey A. Rosenbloom, Senior Attorney, USSC to Steve Newman, Delta Star (Feb. 1,

---

[3]Curiously, the document Delta Star filed in response to RG&E's local rule statement of facts is labeled, "Plaintiff's Local Rule 56.1 Statement."

2006), at 1 (Compl., at Ex. F.).) Further, USSC's counsel stated that Delta Star's January 25 letter and the financial information provided by Delta Star at USSC's request showed that "Delta Star's financial condition over the last few years appears to be deteriorating significantly as total assets are decreasing, total liabilities are increasing, net sales are declining, deferred revenues are increasing, net income is decreasing, and late payments to vendors are increasing." (*Id*.) USSC's counsel again asked Delta Star for "adequate assurances" "that show clearly Delta Star is ready, willing and able to perform its obligations under the Agreement…." (*Id*.)

Delta Star's president, Ivan H. Tepper, responded in a six-page letter dated February 3, 2006. He pointed out that USSC drafted the force majeure provision in the Agreement, and that it was applicable to Delta Star's predicament (facing an unforeseeable "world-wide severe shortage of raw materials which has choked the supply"). (Letter from Ivan H. Tepper to Jeffrey A. Rosenbloom, Steven W. Oakes & Jessica Raines (Feb. 3, 2006), at 2 (Compl., at Ex. G.).) In his letter, Mr. Tepper further wrote, "[w]e assure you that we are ready, willing, and able to perform." (*Id*., at 4.) He invited USSC's personnel to "meet in good faith to resolve any and all issues including, of course, a reasonable delay to delivery and alternative grades of steel." (*Id*., at 5.)

On February 7, 2006, Jessica Raines, Vice President of USSC, responded to Mr. Tepper. (Letter from Jessica Raines to Ivan H. Tepper (Feb. 7, 2006) (Compl., at Ex. H.).) She stated that in the January 27, 2006, telephone conference call, USSC informed Delta Star that,

> it would not change the price, or agree to loan Delta Star approximately $500,000, but would discuss modifications to delivery dates and grades of steel, on condition that Delta Star, as previously requested, provide USSC

> with the adequate assurances of its performance, in writing, by February 3, 2006.…
>
> USSC requested adequate assurances of performance, and instead received a diatribe "venting" in attempt to intimidate and coerce USSC to give in to Delta Star's demands. Clearly, Delta Star's response fails to provide any assurances, let alone adequate assurances of performance.…
>
> USSC has no choice but to view Delta Star's actions and letters as a repudiation of the Agreement because Delta Star has failed to provide adequate assurances that Delta Star can and will comply with the Agreement. Accordingly, USSC considers Delta Star's repudiation as final and hereby terminates the Agreement, effective immediately.

(*Id*., at 1.) In a letter dated February 8, 2006, Mr. Tepper stated that,

> [o]n Monday, February 13, 2006 your units will be formally removed from our production schedule. In the meantime, we are attempting to stop the receipt of raw materials, materials, and components specifically ordered for your units. Perhaps if you had participated in earlier discussions, my six-page letter of February 3, 2006 would not have been necessary.

(Letter from Ivan H. Tepper to Jessica Raines (Feb. 8, 2006), at 1 (Compl., at Ex. I.).)


## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).   "[T]he movant must make a *prima facie* showing

that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). More-over, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of

conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. FED. R. CIV. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

### Motion to Strike

Federal Rule of Civil Procedure 12(f) permits the Court to strike "from any pleading any insufficient defense or any redundant, immaterial, [or] impertinent ... matter." In order to prevail on a motion to strike a defense, the movant must satisfy the following three-part test:

> First, there may be no question of fact which might allow the defense to succeed.... Second, there may be no substantial question of law, a resolution of which could allow the defense to succeed.... Third, plaintiff must show that it is prejudiced by the inclusion of the defense.

*SEC v. Toomey*, 866 F. Supp. 719, 722 (S.D.N.Y. 1992). As the Southern District observed in *County Vanlines Inc. v. Experian Information Solutions, Inc.*, 205 F.R.D. 148 (S.D.N.Y. 2002):

> With regard to the first requirement, unless it is certain that the plaintiff will prevail despite any possible state of facts, the motion to strike must fail. *See Salcer*, 744 F.2d at 939; *see also Bennett v. Spoor Behrins Campbell & Young*, 124 F.R.D. 562, 564 (S.D.N.Y.1989) ("Even if it is unlikely that defendant could prove a sufficient set of facts to prevail on its defense, when the possibility of a meritorious defense exists, the Court must, absent a showing of prejudice or injury to plaintiff, deny the motion to strike the affirmative defense."); *Verges v. News Syndicate Co.*, 11 F.R.D. 587, 589

(S.D.N.Y.1951) (stating that "[i]f the insufficiency of a defense is based upon facts, their interpretation and application, or upon inferences to be drawn therefrom, such inferences are for the triers of the fact").

The second requirement recognizes that a motion to strike "is not intended to furnish an opportunity for the determination of disputed and substantial questions of law." *United Artists Assoc., Inc. v. NWL Corp.*, 198 F. Supp. 953, 959 (S.D.N.Y.1961) (citations omitted). In *Toomey*, 866 F. Supp. at 722, the court noted that "[i]t is particularly important to refrain from considering disputed questions of law when...there has been no significant discovery."

Finally, absent a showing of prejudice, the motion to strike must be denied. *See American Mach. & Metals, Inc. v. De Bothezat Impeller Co.*, 8 F.R.D. 306, 308-09 (S.D.N.Y.1948) (denying a motion to strike on the ground that the moving party failed to allege "that it would be prejudiced were the attacked allegations permitted to remain"). Furthermore, while "increased time and expense of trial may constitute sufficient prejudice to warrant granting [a motion to strike]," *See Toomey*, 866 F. Supp. at 722, mere assertions by the moving party that he is prejudiced are insufficient. *See Fleischer v. A.A.P., Inc.*, 180 F. Supp. 717, 721 (S.D.N.Y.1959) (stating that prejudice is not assumed simply by the "inclusion in the amended complaint of the verbose, immaterial, conclusory, or evidentiary matter").

*County Vanlines Inc.*, 205 F.R.D. at 153.

## ANALYSIS

RG&E contends in its memorandum of law that: a rise in the price of steel is not a force majeure; a rise in the price of steel does not create a commercial impracticability or a failure of presupposed conditions; there is privity between Delta Star and RG&E; and the Agreement was supported by valid consideration. RG&E further contends that "by dismissing the defenses, which are deficient as a matter of law, unnecessary discovery will be eliminated…." (RG&E Mem. of Law, at 4.) Primarily at issue in the motion before the Court is whether the force majeure clause applied to the situation faced by Delta Star. Consequently, the Court will address that issue first.

### New York Law Applies

The parties concur that although the Agreement before the Court calls for the application of both New York and Maine law, the Court need only consider New York law. (Pl.'s Mem. of Law, at 3; *see, generally,* Def.'s Mem. of Law (discussing application of New York law.)

### Force Majeure Clause

The leading treatise on contracts provides the following explanation for the purpose of a force majeure clause in a contract:

> Because most courts have held that failure to cover a foreseeable risk in the contract deprives a party of the defense of impossibility, the best way to protect a party's interests is to address the risk of supervening events expressly in the agreement. Such a clause can take many forms and serve many purposes. It may be a force majeure clause discharging the party, an excusable-delay clause giving the party additional time to complete performance, a termination clause granting the party the right to terminate if certain events transpire, or a flexible-pricing clause allowing it to pass on increased costs to the other party. Provisions dealing with strikes and labor disputes are common. Subject to a statute of frauds defense, force majeure clauses may be enforceable even if oral.

14-74 Corbin on Contracts § 74.19 (footnotes omitted). A force majeure clause's primary purpose is to "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985); *see also United Equities Co. v. First National City Bank*, 52 A.D.2d 154, 157 (1976), *aff'd,* 41 N.Y.2d 1032 (1977).

> The burden of demonstrating force majeure is on the party seeking to have its performance excused,…and the non-performing party must demonstrate its efforts to perform its contractual duties despite the occurrence of the event that it claims constituted force majeure.

*Phillips*, 782 F.2d at 319 (citations omitted). "Mere impracticality or unanticipated difficulty is not enough to excuse performance." *Phibro Energy, Inc. v. Empresa de Polimeros de Sines Sarl*, 720 F. Supp. 312, 318 (S.D.N.Y. 1989) (citation omitted). As the Southern District went on to say,

> New York law provides that ordinarily, a force majeure clause must include the specific event that is claimed to have prevented performance. *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900, 902-03 (1987). Moreover, the Supreme Court has held that the event must not only be one included in the force majeure clause, but must be unforeseeable as well. *United States v. Brooks-Callaway Co.*, 318 U.S. 120, 122-23 (1943).

*Phibro Energy*, 720 F. Supp. at 318 (some citations omitted).

The New York courts have held that non-performance based on a force majeure clause is excusable "only if the force majeure clause specifically includes the event that actually prevents a party's performance." *Kel Kim Corp v. Central Markets*, 70 N.Y.2d 900, 902-03 (1987). "Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract." *Kel Kim*, 70 N.Y.2d at 902 (citations omitted). "However, financial difficulty does not, in and of itself, make out an impossibility defense." *Bank of America Nat'l Trust & Sav. Ass'n v. Envases Venezo-lanos, S.A.*, 740 F. Supp. 260, 267 (S.D.N.Y. 1990), *aff'd* 923 F.2d 843 (2d Cir. 1990). "Financial difficulties growing out of a general business slowdown or recession may cause personal inability to perform but do not usually constitute an excuse by impossibility of performance." 14-74 Corbin on Contracts § 74.7.

The contract at issue defines force majeure as follows:

Force Majeure shall mean a cause or event that is not reasonably foreseeable or otherwise caused by or under the control of the Party claiming Force Majeure, including acts of God, fires, floods, explosions, riots, wars, hurricane, sabotage terrorism, vandalism, accident, restraint of government,

> governmental acts, injunctions, labor strikes, other than those of Seller or its suppliers, that prevent Seller from furnishing the materials or equipment, and other like events that are beyond the reasonable anticipation and control of the Party affected thereby, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences, and which events or the effects thereof are not attributable to a Party's failure to perform its obligations under this Agreement.

(Agreement ¶ 20, Compl., at Ex. A). The language in the sentence, "including acts of God…" sets forth the type of unforeseeable events that the parties agreed would constitute a force majeure. That sentence also states, "and other like events…" The New York Court of Appeals held in *Kel Kim*, that

> contractual force majeure clauses—or clauses excusing nonperformance due to circumstances beyond the control of the parties—under the common law provide a similarly narrow defense. Ordinarily, only if the force majeure clause specifically includes the event that actually prevents a party's performance will that party be excused.

*Kel Kim*, 70 N.Y.2d at 902-03. The Court of Appeals also addressed the interpretation of "catchall" clause, by stating that,

> The principle of interpretation applicable to such  clauses is that the general words are not to be given expansive meaning; they are confined to things of the same kind or nature as the particular matters mentioned (see, 18 Williston, Contracts § 1968, at 209 [3d ed 1978]).

*Id.* Here, the force majeure clause does not specifically mention an increase in price for the steel used to build the transformers. Therefore, the Court must determine whether the "catchall" clause includes that contingency, or, in other words, was the world-wide shortage of steel and the subsequent rise in price "beyond the reasonable anticipation and control of the Party affected thereby." Certainly, Delta Star could not control the price of steel. However, RG&E points out that in answers to interrogatories, Delta Star conceded that the price of steel it has purchased since 2004 has fluctuated from seventy-five cents a pound

-14-

to as much as $1.95 per pound. Thus, RG&E contends that Delta Star  could have reasonably anticipated the rise in price for steel and also did not fulfil their obligation to make "reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences…."

### *Defense of Commercial Impractibility and Failure of Presupposed Conditions*

The defense of commercial impractibility implicates the Uniform Commercial Code. Section 2-615 of the UCC, Excuse by Failure of Presupposed Conditions, states, in relevant part:

> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
>
> (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

N.Y. U.C.C. § 2-615(a) (2004). Official comment four under this section states:

> 4. Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shutdown of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance is within the contemplation of this section.  (*See Ford & Sons, Ltd., v. Henry Leetham & Sons, Ltd.*, 21 Com.Cas. 55 (1915, K.B.D.).)

U.C.C. § 2-615 Comment 4. A New York court addressed the application of this section in

*Maple Farms Inc. v. City School Dist. of the City of Elmira*, 76 Misc.2d 1080 (N.Y. Sup. Ct.

1974). There, the plaintiff sought to be relieved from a fixed price contract for supplying

milk to the school district in the face of ever-rising milk prices which would have caused a

substantial loss on the contract. The New York court found that, "the contingency causing

the increase of the price of raw milk was not totally unexpected." *Id.*, at 1085.

Consequently, the court concluded that,

> [t]here is no precise point, though such could conceivably be reached, at
> which an increase in price of raw goods above the norm would be so
> disproportionate to the risk assumed as to amount to 'impracticality' in a
> commercial sense. However, we [sic] cannot say on these facts that the
> increase here has reached the point of 'impracticality' in performance of this
> contract in light of the risks that we find were assumed by the plaintiff.

*Id.*, at 1085-86. Section 2-615 also addresses governmental interference, by stating in an

official comment that, "[h]owever, governmental interference cannot excuse unless it truly

'supervenes' in such a manner as to be beyond the seller's assumption of risk." N.Y.

U.C.C. § 2-615 Comment 10.

In *Maple Farms*, the governmental action was setting the price of milk, subsidizing

it for the school district, and selling grain to Russia. Here, the allegation is that government-

run companies in China are buying up the M3 steel causing the subsequent shortage in

this country. However, as Delta Star pointed out in its letter to RG&E, a suitable

replacement steel, M4, was available, albeit at a higher price. The March 2005 magazine

article presented as Appendix A to RG&E's memorandum of law in support of its

application indicates, that from December 20, 2004, headlines showed that steel prices

were increasing, dropping, rebounding, and dropping. John Cross, P.E. *Steel Market

Trends*, MODERN STEEL CONSTRUCTION, March 2005.[4] One of the suggestions contained

---

[4] Available at http://www.modernsteel.com/Uploads/Issues/March_2005/30739_cross.pdf (last
accessed Feb. 3, 2009).

in the article is the "need for clear bid documents specifying which party is to assume the risk of a change in material prices." *Id*. The Second Circuit addressed this issue in *Health-Chem Corp. v. Baker*, 915 F.2d 805 (2d Cir. 1990), stating that, "the fact that the subsequent decline in the price of its stock made Health-Chem's performance of the contract more onerous does not establish a basis for a defense of frustration of purpose or commercial impracticability." *Id*., at 810. The Circuit Court cited to *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 768 n. 12 (1983) ("Economic necessity is not recognized as a commercial impracticability defense to a breach of contract claim."), *Canfield v. Reynolds*, 631 F.2d 169, 177 (2d Cir.1980) ("The mere fact that this undertaking may have become burdensome, as a result of subsequent, perhaps unanticipated, developments, does not operate to relieve Reynolds of his obligation."), and *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281-82 (1968) ("performance by Savoy was at all times possible, although unprofitable, since the hotel could simply have remained in business, and the legal excuse of impossibility of performance would not be available to it.").

The Court concludes that no material issue of fact precludes summary judgment on the defense of *force majeure* and the related defense of commercial impractibility and failure of presupposed conditions. However, both affiants stated that M4 steel was available, albiet at a much higher price. "While it was also very difficult to obtain, ultimately Delta Star was able to secure a new supplier, albeit at a much higher price." (Jaroszewski Aff. ¶ 6.) To paraphrase the Second Circuit, "[t]he mere fact that this undertaking may have become burdensome, as a result of subsequent, perhaps unanticipated, developments, does not operate to relieve [Delta Star] of [its] obligation." *Canfield*, 631 F.2d at 177.

***Privity of Contract***

Delta Star raised the defense of lack of privity between RG&E and USSC and, in its memorandum of law opposing RG&E's motion, states,

> Since the initiation of this lawsuit, counsel for Rochester has represented that USSC was Rochester's agent and that they are indistinguishable for purposes of their legal rights and obligations under the contract. Delta Star has not been provided the agreement between Rochester and USSC or any other documentation confirming this legal arrangement, despite having served specific discovery requests seeking this information. If, in fact, Rochester provides the documentation demonstrating it is the true party to the contract with Delta Star, then Delta Star would voluntarily dismiss this affirmative defense.

(Delta Star Mem. of Law, at 19.) The complaint states that RG&E retained USSC to act as its purchasing agent and Delta Star negotiated to sell eight transformers to RG&E. (Compl. ¶¶ 4-7.) The purchase agreement, attached to the Complaint as Exhibit A, lists the purchaser as "Rochester Gas & Electric (RGE), 89 East Ave., Rochester, NY 14649," and lists the seller as "Delta Star, Inc., PO Box 10429, Lynchburg, VA 24506-0429." Under the last term of the contract, "Acceptance," are the signatures of the "authorized representatives of the Purchaser and Seller," that is, Utility Shared Services for the purchases, and Delta Star for the seller. (Ex. A ¶ 35.)

> It is old law that a third party may sue as a beneficiary on a contract made for his benefit. (*Lawrence v Fox*, 20 NY 268; 17A CJS, Contracts, § 519 [3]; 10 NY Jur, Contracts, § 237.) However, an intent to benefit the third party must be shown (*Beveridge v New York El. R. R. Co.*, 112 NY 1, 26; *Cerullo v Aetna Cas. & Sur. Co.*, 41 AD2d 1), and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts. (*Associated Flour Haulers & Warehousemen v Hoffman*, 282 NY 173, 180; *Moch Co. v Rensselaer Water Co.*, 247 NY 160; *Simpson*, Contracts, § 117.)

*Port Chester Elec. Const. Co. v. Atlas*, 40 N.Y.2d 652, 655 (1976). "[W]here the plaintiff seeks to base his right to maintain his action against a third party upon a contract made between that party and another, it must be one made or intended for his benefit. Such a beneficial intent must be clearly found in the agreement." *Beveridge v. New York El. R. Co.,* 112 N.Y. 1, 26, 19 N.E. 489, 496 (1889). Here, the contract makes it clear that RG&E was the intended beneficiary of the agreement to purchase the transformers.

### Failure of Consideration

In its memorandum of law opposing summary judgment, Delta Star argues that since RG&E, or USSC, was required to make a progress payment of 10% of the contract price before January 9, 2006, and did not do so, it can rely on the affirmative defense of failure of consideration. (Delta Star Mem. of Law, at 20.) In *Holt v. Feifenbaum*, 52 N.Y.2d 291 (1981), the New York Court of Appeals reviewed the historical underpinnings of the modern day concept of legally sufficient consideration and wrote that,

> dual notion of consideration as either a benefit to the promisor or a detriment to the promisee has persisted to the present day and has become an integral part of our modern approach to the enforceability of contracts. Thus, it has repeatedly been stated that "'[a] valuable consideration may consist of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other'" (*Rector of St. Mark's Church v Teed*, 120 NY 583, 586 [1890], quoting 3 Am & Eng Cyclopedia of Law, p 831; *accord Allegheny Coll. v National Chautau-qua County Bank of Jamestown*, 246 NY 369, 373 [1927]; *Walton Water Co. v Village of Walton*, 238 NY 46, 50-51 [1924]; *Union Bank of Brooklyn v Sullivan*, 214 NY 332, 339 [1915]; Restatement, Contracts 2d, § 75). Indeed, we have expressly held that a promisee who has incurred a specific, bargained for legal detriment may enforce a promise against the promisor, notwithstanding the fact that the latter may have realized no concrete benefit as a result of the bargain (*Melville v Kruse*, 174 NY 306; *Hamer v Sidway*, 124 NY 538).

*Holt*, 52 N.Y.2d at 299. Relying on *First Fed. Sav. Bank v. Nomura Sec. Int'l*, No. 93 Civ.

2519 (LAP), 1995 U.S. Dist. LEXIS 4770 (S.D.N.Y. Apr. 12, 1995), which held that,

> Failure of consideration exists "whenever one who has promised to give some performance fails…to receive in some material respect the agreed exchange for that performance." 6 Samuel Williston, Williston on Contracts § 814 at 12-14 (3d ed. 1962). Under such circumstances, this defense—which does not relate to the formation of a contract but to its performance—applies whether the failure is due to fraud, mistake, impossibility, or willful breach of contract or whether the failure occurs without any wrongdoing on the part of either party. When applicable, the defense gives the "disappointed party…the right to rescind the contract." *Id*. § 814 at 14-16; *see also Fugelsang v. Fugelsang*, 131 A.D.2d 810, 517 N.Y.S.2d 176, 177 (2d Dep't 1987) ("Failure of consideration gives the disappointed party the right to rescind the contract.").

*First Fed. Sav. Bank*, 1995 U.S. Dist. LEXIS 4770, at 14-15. RG&E responds to Delta

Star's argument that it's obligation to make progress payments was triggered when

progress payments were invoiced per the schedule in the contract. (RG&E Ex. 1, at 26.)

Delta Star sent its letter on December 7, 2005, informing RG&E of the *force majeure* claim,

and the first progress payment was to have been invoiced on January 9, 2006. Since the

progress payment was not invoiced while RG&E and Delta Star exchanged correspon-

dence about the steel shortage, the evidence before the Court on this motion establishes

the inapplicability of the defense of failure of consideration.

## CONCLUSION

For the foregoing reasons, RG&E's application to strike Delta Star's defenses of

(1) doctrine of commercial impractibility, (2) force majeure, (3) failure of presupposed

conditions, (4) lack of privity, and (5) failure of consideration, is granted.

IT IS SO ORDERED.

Dated:   February 13, 2009
            Rochester, New York

ENTER:

/s/ Charles J. Siragusa_____
CHARLES J.  SIRAGUSA
United States District Judge